ULSTER TOOL AND DIE
CORPORATION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 80 Civ. 4949 (WCC).

United States District Court,
S. D. New York.

Oct. 22, 1981.

Spizz & Gans, Mineola, N. Y., for plaintiff; Harvey W. Spizz, Mineola, N. Y., of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for defendant; Harvey J. Wolkoff, Jane E. Booth, Asst. U. S. Attys., New York City, of counsel.

OPINION AND ORDER

CONNER, District Judge:

Plaintiff Ulster Tool and Die Corporation ("Ulster Tool") initiated this tax refund suit to recover back taxes and a fraud penalty assessed by the Internal Revenue Service due to Ulster Tool's allegedly fraudulent failure to report $55,466.52 in income on its 1970 return. Ulster Tool has moved for summary judgment against defendant United States of America ("the Government") on three grounds: (1) that even if the $55,466.52 constituted income in 1970, Ulster Tool was entitled to an offsetting theft deduction for that year; (2) that the Government is collaterally estopped from litigating the deduction issue by virtue of an earlier Tax Court opinion; and (3) that, as a matter of law, the Government cannot prove that Ulster Tool acted fraudulently in failing to report the $55,466.52.

*Background*

Ulster Tool is a privately held New York corporation engaged in the business of manufacturing and selling special tooling and precision parts. At all times material to this litigation, the corporation's stock was owned in equal amounts by Anthony Pizzarelli ("Pizzarelli") and Frank Falatyn ("Falatyn"). Pizzarelli and Falatyn also served as the sole officers and directors of the corporation at all relevant periods. The present litigation stems from the diversion by Pizzarelli of two checks (totaling $55,466.52) belonging to Ulster Tool. This diversion of funds occurred in the early part of 1970 and was discovered by Falatyn in February of that year. After discovering that the checks were missing, Falatyn confronted Pizzarelli who admitted taking the checks. At this point, according to the Government, Pizzarelli orally agreed to repay the corporation. Ulster Tool characterizes this confrontation as resulting merely in "an agreement to agree to terms in the future." According to plaintiff, when Falatyn confronted Pizzarelli in 1970, Pizzarelli did not oblige himself to make restitution to

the corporation, but, at the very most, agreed to settle the matter before an attorney. In any event, a written agreement for repayment was entered into in November of 1970,[1] when the two men met with Ulster Tool's attorney, Raymond Pezzo ("Pezzo"). At this meeting, Pezzo drafted corporate minutes which authorized Ulster Tool to lend Pizzarelli $60,000. These minutes were then backdated to October of 1969, prior to the diversion. When Ulster Tool filed its income tax return for its fiscal year ending August 31, 1970 the return did not reflect as income the $55,466.52 diverted by Pizzarelli.

*Discussion*

### A. Theft Loss Deduction

Section 1.651–1(a)(3) of the Internal Revenue Regulations authorizes a deduction for losses due to theft. The regulation also provides, however, that the deduction may be taken only if, at the end of the taxable year in which the theft occurs, the taxpayer has no reasonable prospect of recovery. In its papers, Ulster Tool asserts that no tax was due on the unreported $55,466.52 of income because Pizzarelli's embezzlement of those funds entitled the corporation to such a deduction. According to plaintiff, there was no contractual obligation to repay the diverted funds until the next taxable year. Therefore, Ulster Tool argues, the corporation had no reasonable prospect of repayment at the end of its 1970 tax year and was entitled to a theft deduction in that year.

The Government disputes both Ulster Tool's interpretation of the relevant law and its statement of the facts. As a factual matter, the Government contends that Pizzarelli, during his initial confrontation with Falatyn, in February of 1970, orally agreed to repay the money. The Government apparently concedes that there was no discussion of definite repayment terms at this point. This agreement, the Government argues nonetheless, combined with Pizzarelli's continued association with the corporation and his stable financial position, provided

Ulster Tool with a "reasonable prospect" of repayment before the end of fiscal 1970. To support this argument, the Government relies on *Still v. Commissioner of Internal Revenue*, 19 T.C. 1072 (1953), *aff'd on the opinion below*, 218 F.2d 639 (2d Cir. 1955). Somewhat surprisingly, Ulster Tool cites this same case to support its proposition that a reasonable prospect of recovery exists only where, before the end of the taxable year, a financially secure embezzler enters into a promise, "tantamount to a contractual obligation," setting forth the exact terms of the repayment.

In *Still*, the corporate taxpayer claimed entitlement to a theft deduction based on the embezzlement of certain proceeds by two 10% shareholders. 19 T.C. at 1075. The theft was discovered during the taxable year and promises were elicited from the shareholders to repay the diverted funds. The Tax Court held that the taxpayer had failed to establish entitlement to the deduction, stating

"[w]hen their wrongdoing was discovered during the taxable year, [the 10% stockholders] promised to make restitution. This is a promise that may not lightly be ignored. No criminal charge appears to have been lodged against either of them. Neither was discharged or suspended; both continued to serve as officers of petitioner; and both did in fact make repayment in October, 1946...." 19 T.C. at 1075.

It is difficult to determine how Ulster Tool reads this case to support the proposition that a "reasonable prospect of recovery" must be embodied in definite contractual terms. Rather, the standard in this Circuit appears to be a flexible one involving factors such as (1) whether a promise to repay was made; (2) whether the embezzler continued in the corporation's employ; and (3) whether the corporate taxpayer demonstrated a belief that the promise would be made good. The Second Circuit, in affirming the Tax Court's decision in *Still*, demonstrated the flexibility of this standard.

---

1. Ulster Tool's taxable year for 1970 ended on August 31, 1970.

"In *Earle v. Commissioner*, 72 F.2d 366 (2d Cir. 1934) we held that the obligations to repay which the law imposes upon an embezzler does not prevent deduction of the loss in the year the embezzlement occurred even though there is no proof of his financial ability to repay. This decision is distinguishable. Here, the embezzlers promised to repay, they retained their offices and their promise was apparently accepted as assurance that their misappropriation would be made good, as it subsequently was." 218 F.2d at 640.

■ In any event, it appears there exists a dispute between the parties as to whether, and if so under what circumstances, Pizzarelli made an actual oral promise to repay the corporation when the loss was discovered in February of 1970. Clearly, summary judgment cannot be granted where there are disputed questions of material fact. See Rule 56, F.R.Civ.P.; *SEC v. Research Automation Corporation*, 585 F.2d 31 (2d Cir. 1978). In this case it will be necessary to proceed to trial to determine whether Ulster Tool had a reasonable prospect of recovery in fiscal 1970, chief among the factors being whether Pizzarelli promised to repay the money in February of 1970. Ulster Tool may be able to support its contention that the February 1970 conversation between Pizzarelli and Falatyn was insufficient to provide a reasonable prospect of recovery at that time, but this cannot be done without a trial.

### B. Collateral Estoppel

■ In its next line of attack, Ulster Tool argues that the Government is collaterally estopped from litigating the issue of whether Pizzarelli promised to repay the diverted monies. Ulster Tool contends that a prior decision by the Tax Court considering whether the embezzled money constituted income to Pizzarelli "necessarily" decided the issue here. This argument is, at best, misplaced. It is black letter law that the doctrine of collateral estoppel requires that the issue decided in the first case be identical to the issue sought to be foreclosed in the second. *E.g., Herendeen v. Champi-*

*on International Corporation*, 525 F.2d 130, 133 (2d Cir. 1975). And, although *res judicata* applies both to issues that were or might have been raised in the first suit, see *Grossman v. Axelrod*, 466 F.Supp. 770 (S.D. N.Y.1979), aff'd, 646 F.2d 768 (2d Cir. 1981), collateral estoppel precludes relitigation only of issues actually litigated previously. See *Durham Industries, Inc. v. North River Insurance Co.*, 482 F.Supp. 910 (S.D.N.Y. 1979).

■ In *Pizzarelli v. Commissioner*, 40 T.C.M. ¶ 80 (1980) the Tax Court held that the embezzled money constituted income to Pizzarelli and should have been reported by him in 1970. The court, in reaching this conclusion, rejected Pizzarelli's defense that the money was in fact a loan and thus was not includible in gross income. The court stated that

". . . petitioner did not receive an authorized loan at the time he diverted the . . . checks. Further we find that throughout 1970 petitioner's receipt of the proceeds was not intended as a loan." 40 T.C.M. at 161.

Ulster Tool reads this language as conclusive of the issue whether there was a subsequent agreement to repay the diverted money. Such a reading, however, overlooks the distinction between an embezzlement case, in which the main issue is whether the taxpayer had authorization to take the money, and a theft deduction case, which focuses on whether there was a reasonable expectation of recovery. The fact that the Tax Court found that Ulster Tool had not lent the $55,466.52 cannot foreclose inquiry into whether he made a subsequent promise to replenish the corporate coffers. The Tax Court itself specifically avoided making any ruling on that issue, stating that

". . . for purposes of this case it is sufficient to hold that there was no intent by petitioner to borrow from his corporation at the time he took the two checks, and we need not speculate on the existence of any subsequent agreement to repay." *Id.*

Clearly, the Tax Court's opinion cannot be read as foreclosing litigation on the theft deduction here and Ulster Tool's argument that it does is rejected.

## C. *Fraud*

Ulster Tool's last argument in support of its motion is that, as a matter of law, the Government will not be able to prove that the corporation acted fraudulently in failing to report the $55,466.52.[2] According to plaintiff, the "combined effect" of *Klembach v. Commissioner,* 30 T.C.M. 723 (1971),[3] and *Asphalt Industries, Inc. v. Commissioner,* 384 F.2d 229 (3d Cir. 1967), demonstrates that the corporation cannot be found to have participated in Pizzarelli's fraud. The Government disputes the applicability of these cases and argues that *Still* sets forth the relevant fraud standard in this jurisdiction.

In *Asphalt Industries* the Court of Appeals for the Third Circuit ruled that the fraud of one 50% shareholder should not be imputed to the corporation when the other 50% shareholder was completely innocent. 384 F.2d at 235. The court, in reaching that conclusion, was influenced by the innocent shareholder's lack of involvement in the corporation and the fraud itself. Most importantly, the innocent stockholder was unaware of the diversions at the time the corporate returns were filed and when the embezzlement was discovered years later, the shareholder reported it immediately to his counsel and the IRS. *Id.* at 230.

The Government contends that *Asphalt Industries* does not reflect the law of this Circuit and directs the Court's attention instead to the Tax Court's opinion, as affirmed by the Second Circuit, in *Still.* In the latter case it was two 10% stockholders who diverted monies that would otherwise have been income to the corporation; however, one of the corporate officers learned of the embezzlement prior to the filing of the tax return and nevertheless failed to inform the accountants about it. The Tax Court found the corporation liable for tax fraud, stating

"[p]etitioner is a corporation, and as such can act only through its officers. . . . All three [officers] were aware, prior to the close of the taxable year and prior to the filing of the original corporate returns, that all sales were not reflected on its books. Despite this knowledge on the part of these officers, the corporation filed tax returns in which this unrecorded income was not disclosed." 19 T.C. at 1077.

■ It is not necessary at this time to determine which, if any, of these decisions governs the present action. Clearly the fraud issue here cannot be resolved by summary judgment. The parties, even while arguing the applicable law, demonstrate sharp differences over the facts surrounding Falatyn's involvement. Ulster Tool compares Falatyn to the "innocent" shareholder in *Asphalt Industries*; according to plaintiff, Falatyn was only peripherally concerned with the corporate finances and believed that Pizzarelli would inform the accountant of the diverted income. The Government, for its part, depicts Falatyn as mistrustful of his associate and as keeping close tabs on the corporate finances. The Government asserts that Falatyn, as well as Pizzarelli, omitted to inform the accountant of the missing funds. From the face of these contentions it is apparent that the extent of Falatyn's involvement and knowledge presents disputed issues of material fact under either standard urged by the litigants. Thus, the case must proceed to trial.

## Conclusion

For the reasons stated above, plaintiff's motion for summary judgment is denied.

SO ORDERED.

---

2. Because the assessment against Ulster Tool would otherwise be time barred under 26 U.S.C. § 6501 because not assessed within three years, the Government must prevail on the fraud issue in order to succeed in this action.

3. To the extent that *Klembach* deals with individual tax fraud rather than corporate liability, it is not dispositive of the issue here.